IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| JOHNNIE LEE FOSTON, | ) | Cause No. CV 11-36-M-DWM-JCL |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND RECOMMENDATION |
| | ) | OF U.S. MAGISTRATE JUDGE |
| WARDEN SAM LAW; | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF MONTANA, | ) | |
| | ) | |
| Respondents. | ) | |

On February 22, 2011, Johnnie Lee Foston ("Foston") filed this action for writ

of habeas corpus under 28 U.S.C. § 2254. After review of the petition in light of the

state court pre-trial and trial transcripts, counsel was appointed to represent Foston.

An Amended Petition was filed on May 20, 2011. On June 30, 2011, Respondent

("the State") filed an Answer and a motion to dismiss.

## I. Background

Initially, Foston was charged with one count of criminal distribution of

dangerous drugs in violation of Mont. Code Ann. § 45-9-11 (2005). Under Montana

1

law, "a person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug, as defined in 50-32-101." Mont. Code Ann. § 45-9-101 (2005). Although the statute does not require *scienter*, the Montana Supreme Court holds that the State must also prove the defendant knew drugs were involved in the transaction. *State v. Brown*, 755 P.2d 1364, 1367 (Mont. 1988) ("To sell drugs means to knowingly and intentionally transfer possession or ownership of the drugs to another") (quoting *State v. Martinez*, 700 P.2d 991, 992 (Mont. 1985)) (brackets omitted); *State v. Anderson*, 498 P.2d 295, 351 (Mont. 1972); *see also* Trial Tr. (doc. 7-3) at 377:8-378:10.

The State accused Foston of selling four ounces of cocaine to a confidential informant, who was wearing a wire. The charged transaction was the last of three that had occurred. The first occurred in the informant's vehicle, the second at a motel, and the third at the same motel and in a parking lot. The informant and Foston were the only parties to the transactions.

## A. Pre-Trial Hearing

Before trial, the State advised Foston's trial counsel, Christopher Daly, that it did not intend to call the informant at trial. Daly moved to compel the State to identify the informant and produce all the recordings made of each of the controlled

buys. Invoking Mont. Code Ann. § 46-15-324(3), the State resisted production, arguing that disclosure would result in substantial risk to the informant and nondisclosure would not infringe on Foston's constitutional rights.

A hearing on the motion was held on October 29, 2007. Missoula County Detective Scott Newell, who was in charge of the investigation, testified. When Daly asked whether the informant had been involved with the criminal justice system, Newell replied, "Hmm, I don't recall. I think it was learned sometime afterwards that they may or may not have been." Pre-Trial Tr. (doc. 7-1) at 9:18-19. Newell did "not recall any benefit being received" by the informant "in his or her situation with the criminal justice system as a result of the work that he or she did with Mr. Foston." Id. at 9:20-24. Asked whether the informant was paid, Newell said, "I believe they were." Asked how much, he said, "I do not recall." Id. at 9:25-10:3. Asked when the buys took place, Newell did not recall the dates. Asked "how closely connected they were in terms of time," he responded, "I don't recall exactly. I believe they were probably maybe a month apart, several weeks to a month apart."[1] Id. at 10:8-17. Asked where the buys took place, Newell said, "Within Missoula." When Daly asked him to be more specific, the prosecutor objected, and the trial judge asked, "Why do

---

[1] All three transactions occurred between April 4 and May 2, 2007. See Trial Tr. (doc. 7-3) at 294:16, 325:8.

3

you need to know the exact location of these buys, Mr. Daly?" Daly suggested there might be a coercion or entrapment defense. The trial judge limited the question to whether the buys occurred in a public or private place – which, although Daly did not know it at the time, left Newell to decide whether a motel room is a public place or a private place. (He picked "public.") *Id.* at 10:18-11:11. Newell agreed that "as far as [he was] aware there was only one of these three alleged buys that was video recorded,"[2] but it was not the one charged against Foston. Asked whether all three buys were in different places, he said, "Yeah, more or less. Two of them were, definitely. I think you could probably say all three of them. The actual transaction took place in different locations." *Id.* at 12:9-13:8.

Newell "[didn't] believe" but was "not positive" the wire was placed on the informant's person. *Id.* at 11:24-12:8. He did not "script" the phone call for the informant, who was "on their own in terms of the language that they used." *Id.* at 13:14-22. Asked whether it was possible the informant "could have made statements to induce or entrap Mr. Foston," Newell responded, "I don't believe so, no." *Id.* at 13:23-14:2.

Newell confirmed that "this confidential informant does not wish his or her

---

[2] Newell recently told the State's counsel he knew, as of May 11, 2007, that the video recording of the second buy failed, and no recording was attempted at the third transaction. State's Report at 3-4.

identity to be known." *Id.* at 14:4-6. Asked why, Newell said, "Most of the confidential informants that I talk with do not wish their identity to be known in fear of retribution, retaliation, threats on their personal safety." *Id.* at 14:7-12. Asked whether he was aware of "specific threats supposedly coming from Johnny Foston to this person," Newell said "Yes." *Id.* at 15:2-5. He said they were "threats of bodily harm," and, although he did not "know if the word death was necessarily used," he "believe[d] that the informant felt like that was a possibility to their person." *Id.* at 16:20-17:3. Asked when the threats were made, he said, "I do not recall," *id.* at 15:6-8, though he "believe[d] it was after" Foston was charged, *id.* at 16:15-19. Asked whether it was possible the informant's concern was "motivated by an irrational fear of the fact that Mr. Foston is some kind of ghetto drug dealer just because of his race," the prosecution objected that the question "calls for speculation." The detective responded, "I don't think so." The trial judge characterized this answer as "no." *Id.* at 15:12-19. Asked whether it was "possible" that the informant's safety concerns were "imparted by a co-defendant," that is, Demetrius Smith, Newell again said, "I don't believe so." *Id.* at 15:24-16:2.

The trial court denied Daly's motion and followed up with a written order on November 7, 2007:

No testimony or evidence was presented showing how the failure to

5

disclose would infringe the Defendant's constitutional rights. The Defendant's motion devotes two sentences to why he needs the confidential informant disclosed: "Confidential informants have been known to entrap individuals in drug transactions. Mr. Foston cannot properly analyze whether or not he has an entrapment defense unless the videotapes and/or audio tapes are disclosed."

In his reply brief, the Defendant attempts to expand his argument about how his constitutional rights would be infringed if the confidential informant is not identified: "Mr. Foston has the Sixth Amendment right to confront the witnesses against him. He also has the right to counsel which is impeded when counsel cannot adequately inform and advise his client whether to accept a plea deal. He has the right to a fair trial which is impeded when the State does not disclose the evidence against him. . . . [the video tape] is critical to the preparation of his defense."

The Court finds that since the confidential informant will not testify and the video tape will not be introduced, the Defendant has not been deprived of any right to confront an accuser or view the evidence to be used against him. The Court further finds that the claim that counsel cannot advise the Defendant about plea bargains or entrapment defenses without knowing the identity of the confidential informant or viewing the videotape to be at best vague and speculative.

Order (doc. 21-1) at 2-3 (internal parenthetical citations to defense brief omitted) (brackets in original).

Sometime after the defense motion for disclosure of the tapes and the informant's identity was denied, the State charged Foston with the other two controlled buys. Foston was arraigned on the new charges on November 20, 2007. Pre-Trial Tr. (doc. 7-1) at 31:4-6. Daly stated his understanding that the State had changed its tactics and would call the informant as a witness at trial. He sought leave to file another brief in support of disclosure of the informant's identity. *Id.* at 32:1-

13. The prosecutor, Andrew Paul, stated that he "discussed this with law enforcement officers and . . . determined that there is absolutely no need to call upon that witness to testify." *Id.* at 32:9-16. Paul said, "I still resist having to provide the identity of the confidential informant. I think that that person's safety is at great risk if Mr. Foston learns it. And I will not be calling that person at trial." *Id.* at 32:17-20. The trial court declined to reconsider its previous ruling, "based on [Paul's] assertion that [the State is] not going to call them." *Id.* at 32:21-22. Daly did not ask the trial court to conduct an *in camera* review of the recordings to determine whether they could be helpful to Foston.

### B. Trial

Trial commenced on January 9, 2008. The State called four law enforcement officers, Foston's co-defendant Demetrius Smith, a crime lab technician, and Newell. The evidence showed that Foston and the informant were followed and watched throughout the transactions. Except for Newell, each officer testified he did not see Foston with money or with drugs; Newell testified that he saw Foston accept cash from the informant in the second and third buys. Trial Tr. at 187:17-23, 190:16-22, 191:8-13 (Rosling); *id.* at 210:22-211:2 (Lenahan); *id.* at 227:5-10, 229:5-10 (Merifield); *id.* at 251:2-11, 252:1-9, 253:18-23 (Taylor); *id.* at 351:18-23, 352:25-353:6, 354:1-17 (Newell). No one saw Foston carry anything to or from the

transactions. No one saw Foston give anything to the informant.

The first officer to testify, Rosling, explained that he might not have seen Foston with drugs or money because two ounces of cocaine is "smaller than a tennis ball" and, "depending on how it's packaged . . . [i]t [could] be flattened out so it could look like a checkbook size or smaller." Trial Tr. at 193:3-14. After each transaction, the informant gave Newell cocaine packaged in baggies, two ounces in one bag the first time and one bag for each of the six ounces involved in the second and third transactions. *Id.* at 285:3-286:22, 314:18-22, 316:3-13, 323:11-22, 329:13-21.

Newell said "the thought did not cross my mind" to pat down the informant to ensure she was not concealing cocaine on her person before she met with Foston.[3] Trial Tr. at 359:25-360:1. Nor did he pat her down after she met with Foston, to see if she was concealing any of the money or something other than cocaine she might have received from Foston. Even the wire was not placed on the informant's body. *Id.* at 294:22-23, 295:11-22, 318:18-319:1, 321:1-5. Newell explained that, in addition to the fact that it did not occur to him, "we didn't have a female officer around" to pat down the informant. Trial Tr. at 357:5-6. On the other hand, he also testified that a female officer with a K-9 unit participated in the search of Smith's

---

[3] At trial, the informant was consistently referred to as female. *E.g.*, Trial Tr. at 356:22-24 (Paul). At Foston's arraignment on the Amended Information, the informant was referred to as male. Pre-Trial Tr. at 33:5-7 (Paul).

house. *Id.* at 334:14-23, 359:4-360:1. Asked whether he was "satisfied, after [his] visual search" of the informant, that she did not have cocaine on her person, he did not respond by describing her appearance or what she was wearing. He said, "The informant has proven reliable in other investigations, in addition to this one," so that it seemed "highly unlikely that she would be able to have that [cocaine] on her person and not know about it" [sic]. Trial Tr. at 357:7-13; *see also id.* at 292:5-15, 299:8-9, 350:8-13, 353:7-14, 354:18-23. Asked whether she had a drug problem, he said he did not know. *Id.* at 360:2-22.

Rosling also told the jury that a "CI" is a confidential informant whose identity is withheld to protect them because they "fear retribution by the people they're providing information on." Trial Tr. at 164:21-166:1. Newell, too, testified that he wanted to "keep this person's identity confidential" because "not so much the small user but the people who were dealing the drugs, usually are carrying weapons. We see a lot of guns and a lot of knives on people that we bust all the time." *Id.* at 292:19-293:1. Newell told the jury there were recordings of the transactions, but they would not be offered into evidence "to try to protect the identity of our informant." *Id.* at 308:15-311:6.

Newell testified that the informant initiated the transactions by calling Foston, but Newell did not say how he knew it was Foston on the phone. Newell said he

9

could occasionally hear someone's voice but could not discern the words. Newell did not say he recognized the voice. Newell and the informant decided to ask for two ounces the first two times, four ounces the third time. Newell said it was his "understanding" that the price would be $1,400 per ounce. Newell obtained the money in marked bills and gave it to the informant. Trial Tr. at 293:14-294:13, 296:1-297:6.

While the transactions were underway, Newell monitored the wire and could hear what both Foston and the informant said. On one occasion, Newell said, he heard Foston tell the informant to drive from one place back to the convenience store where he had left his vehicle. Trial Tr. at 312:11-13. Other than that, Newell's testimony about the content of the "conversations" between Foston and the informant consisted solely of Newell's statement that their conversations were "consistent with [his] understanding of a drug deal." *Id.* at 349:10-25.

Newell and several other officers saw the informant meet and talk with Foston.[4] During each transaction, Foston left the site where he met her and traveled elsewhere – to Smith's house, in the second transaction – tailed each time by the officers. In a later search of Smith's house, officers found $8,900, including at least $5,400 in

---

[4] It is difficult to tell from the record, but Daly seemed to suggest that Foston and his co-defendant Demetrius Smith were similar in appearance. *See* Trial Tr. at 191:14-24.

marked money from the third transaction. *Id.* at 326:10-16, 336:2-5. They also found

a firearm and, in a discarded sock, "roughly an ounce or two of cocaine." *Id.* at

248:2-3 (Taylor), 259:16-24 (Smith).

Demetrius Smith, Foston's co-defendant, testified under a grant of use- and

derivative-use immunity from both state and federal prosecutors. Trial Tr. at 257:2-

258:1, 274:3-9. He testified that he "just basically went along" with what Foston did.

*Id.* at 265:25. Although Foston did not have a key to Smith's house, *id.* at 270:5-13,

Smith said Foston gave him "thousands and thousands of dollars," *id.* at 277:2-9,

including $6,000 or $7,000 of the $8,900, "to hold it," once in May, not in April, and

two other times around Christmas, *id.* at 260:2-262:10. Smith also said that he

sometimes "held drugs" for Foston, "[j]ust a couple of eight-balls,[5] nothing big or

anything like that," for recreational use together, *id.* at 262:11-263:6, and that they

had purchased two-ounce quantities together in the past, except one occasion when

they purchased ten ounces together for a "party," *id.* at 263:10-20.[6]  Smith also

---

[5] An eight-ball is an eighth of an ounce of cocaine. Trial Tr. at 262:14-15.

[6] The Montana Supreme Court stated that Smith said he held "the" drugs and money for
Foston. *Foston*, 209 P.3d at 265 ¶ 18. Smith said Foston brought the marked money to his house
on May 10 before the search was executed, Trial Tr. at 259:16-260:23, but he did not otherwise
connect the money or drugs involved in the controlled buys with his house. In particular, he did not
mention Foston's stop at his house during the second transaction, *see id.* at 321:16-17 (Newell). It
would take 16 eight-balls to make two ounces; the most Smith said Foston kept at Smith's house was
three. *Id.* at 264:21-23, 270:1-4.

Foston was not seen at Smith's house on the day of the search. Smith said they were both

11

testified that he had loaned money to Foston in the past when Foston "asked for a handout," and "there was nothing you could do about it" if Foston said he would use the money to buy cocaine. *Id.* at 269:3-18. Though Smith inferred that Foston bought and resold cocaine, he did not claim any personal knowledge of the fact, *id.* at 264:9-15, 275:21-277:19.

In closing argument, Daly drew attention to the fact that the informant did not testify and, although the transactions were recorded, they were not provided to the jury. Daly said:

> As I mentioned in voir dire to you, our constitution says that you have a right to confront your accusers. And I asked you to think about that in this case; was that constitutional guarantee met here? Did Mr. Foston have a chance to confront his accusers; when the CI never testified, the video was never shown and the tape was never played?

Trial Tr. at 394:6-12. While the jurors were deliberating, they asked, "Definition of facing your accuser, how does that apply to the confidential informant?" Trial Tr. at 401:15-17. They were instructed:

> This is a matter of law to be resolved by the Court. The function of the jury is to decide questions of fact. The Court must decide questions of

---

there when Foston suddenly "ran by me and ran up the stairs and ran out," "through the upstairs window." Smith said, "I didn't know what he was doing," but "that's when the officers busted in and told me to get on the ground." Trial Tr. at 267:22-268:11. Smith said it was Foston who dropped the sock containing cocaine as he left. Taylor described the location where the sock was dropped out the upstairs window: "just a small portion of that screen was pushed out or cut, and that sock was just outside on the roof." *Id.* at 248:2-8. Smith said that "was the window that Foston went out of." *Id.* at 267:17-18.

law. All laws necessary for the jury to utilize in making its factual decision have been given by the Court.

*Id.* at 406:14-19.

Foston was acquitted of the first transaction and convicted of the second and third. *Id.* at 407:14-25. He was sentenced to serve twenty years on each count, consecutive, for a total of forty years. Twenty years were suspended. Pet. (doc. 1) at 3 ¶ 4; *State v. Foston*, 209 P.3d 262, 262 ¶ 1 (Mont. 2009), *overruled on other grounds by State v. Reichmand*, 243 P.3d 423, 426 ¶¶ 11-12 (Mont. 2010).

## II. Foston's Claims

Foston's original habeas petition, filed *pro se*, raises four claims. The first alleges a violation of his rights under the Sixth Amendment's Confrontation Clause "in light of *Crawford v. Washington*, 541 U.S. [3]6 (2004)," based on Newell's testimony that the conversations between Foston and the informant were "consistent with [Newell's] understanding of a drug deal." Pet. at 4 ¶ 15A. The other three claims allege a violation of his rights against unreasonable search and seizure. He challenges the Montana Supreme Court's decision not to apply retroactively its decision in *State v. Goetz*, 191 P.3d 489 (Mont. 2008), its failure to apply plain error review to "his Fourth Amendment claim in light of *Goetz*," and its denial of a "full and fair opportunity to litigate" his Fourth Amendment claim. Pet. at 5-6 ¶¶ 15B-D.

13

The Amended Petition, prepared by counsel, maintains the first claim and appears to abandon the other three. Am. Pet. (doc. 13) at 4-7; *but see* Answer (doc. 21) at 9-11; Br. in Supp. of Mot. (doc. 24-1) at 26-29 (discussing Claims 2-4).

### III. Analysis

#### A. *Crawford* Claim

At the conclusion of Detective Newell's direct examination, the following exchange occurred:

> Q.    Okay.  At any time while you were monitoring the confidential informant, while the informant was with Mr. Foston, did you hear any voices other than those of the informant and Mr. Foston?
>
> A.    No.
>
> Q.    When you were listening, was the conversation consistent with your understanding of a drug deal?
>
> A.    Yes.
>
> Q.    And is that true with regard to the first controlled buy?
>
> A.    Yes.
>
> Q.    And is that also consistent with the second controlled buy?
>
> A.    Yes.
>
> Q.    And what about the third?
>
> A.    Also with the third.

Trial Tr. at 349:10-25.

Foston asserts that this testimony introduced into evidence testimonial hearsay from the informant in violation of the Confrontation Clause as interpreted by *Crawford v. Washington*, 541 U.S. 36 (2004). *See* Pet. at 4 ¶ 15A; Am. Pet. at 4-5.

In this Court, the parties narrowly frame the determinative issue. They agree that hearsay is the issue and that *Crawford* provides the rule of decision. *E.g.*, Am. Pet. at 6-7; Br. in Supp. of Am. Pet. (doc. 14) at 2-3. In the state courts, too, Foston argued that this portion of Newell's testimony violated *Crawford*.[7] Because the parties agree on the issue, and because there was no *Crawford* violation, there is no need to consider whether the Montana Supreme Court's decision, *see Foston*, 209 P.3d at 264-65 ¶¶ 14-19, was objectively unreasonable under 28 U.S.C. § 2254(d) as to either the *Crawford* issue or harmless error.

Newell did not quote, paraphrase, or summarize the informant's words or, for the most part, Foston's.[8] He did not describe conduct arguably intended by the

---

[7] The trial court held Newell's statement was admissible as a "present sense impression," Trial Tr. at 344:3-345:8, which took the analysis well off-track. Foston asserted that "Newell's testimony recounted statements made by a CI who did not testify at trial," Appellant Br. Direct App. at 15 (doc. 21-3); *see also id.* at 2-9, but he did not point to any "statements" other than those of Newell, quoted above. Similarly, in his Reply, he said, "Newell's testimony *characterizing the conversations* between the CI and Foston clearly constitute evidence of the CI's words or conduct outside the court." Reply Direct App. at 6 (doc. 21-5) (emphasis added).

[8] Foston's statements, of course, would be neither hearsay nor testimonial. Mont. R. Evid. 801(d)(2)(A), (E); *Davis v. Washington*, 547 U.S. 813, 825 (2006) (describing "statements made

15

informant to be assertive. He did not say the conversations actually were a drug deal.

Newell only stated his opinion. Because he did not relay the words or assertive

conduct of the informant, what was admitted was not hearsay. *Crawford*, 541 U.S.

at 60 n.9; Mont. R. Evid. 801(c); *United States v. Hendricks*, 395 F.3d 173, 183 (3d

Cir. 2005).[9] It is not possible to move on from that point or to decide whether, under

*Crawford*, the informant's words or conduct during the conversations would have

been testimonial in nature if Newell had introduced them into evidence.

---

unwittingly to a Government informant" as "clearly nontestimonial"); *United States v. Tolliver*, 454 F.3d 660, 665 & n.2 (7th Cir. 2006).

[9] Foston relies on cases that are distinguishable on this basis. *United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004) ("The government in this case did offer certain statements made by a CI for the purpose of establishing the truth of the matter asserted."); *United States v. Maher*, 454 F.3d 13, 23 (1st Cir. 2006) ("The testimony was immediately followed by a *sua sponte* instruction to the effect that any statements of the confidential informant should not be taken as standing for the truth of the matter asserted (i.e., that Maher was a dealer who supplied Johnson with drugs)."), *cited in* Br. in Supp. of Am. Pet. at 5-6.

Foston also relies in part on *United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994), *cited in* Br. in Supp. of Am. Pet. at 6, a pre-*Crawford* Confrontation Clause case not involving testimonial hearsay. "The principal vice of hearsay evidence is that it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact." *Id.* at 69. And testimony that conveys an absent informant's statements without saying what they were is still hearsay. For instance, an agent cannot say that an absent informant's statements were consistent with a witness-informant's statements without communicating to the jury the content of the absent informant's statements; the jury simply looks to the witness-informant's statement to decide what the absent informant must have said. *See Ocampo v. Vail*, 649 F.3d 1098, 1102-03 (9th Cir. 2011), *cited in* Comb. Reply & Resp. (doc. 30) at 3, 10-11. Even if these cases could apply to some of Newell's testimony, they do not mean that the testimony Foston places at issue "led to the clear and logical inference that out-of-court declarants believed and said that the defendant was guilty of the crime charged." *Favre v. Henderson*, 464 F.3d 359, 364 (5th Cir. 1972), *quoted in Ocampo*, 649 F.3d at 1110 (describing the Confrontation Clause as explained in *Dutton v. Evans*, 400 U.S. 74, 89 (1970)). Newell's characterization led to the clear and logical inference that Newell believed the defendant was guilty.

Two examples prove the point. If Newell had told the jury the informant bent her head toward the wire and said, "Thanks for the cocaine, Johnnie," he would have communicated testimonial hearsay barred by *Crawford*. But what if Newell told the jury she said, "Can you get me a couple of tickets?" *Cf. United States v. Johnson*, 587 F.3d 625, 634 (4th Cir. 2009). Newell's report of that question would not be offered to prove that the informant asked Foston to sell her tickets.

Foston certainly is correct that Newell's testimony amounted to an assertion that a drug deal occurred. But it was Newell's assertion, not the informant's. In the testimony Foston places at issue, the State did not relay the words or substance of statements made by the absent informant. The State told the jury what Missoula County Detective Scott Newell thought of the transactions. The State's presentation of this testimony may well be objectionable,[10] but it does not follow that Newell was "used as little more than a conduit or transmitter for testimonial hearsay," *Johnson*, 587 F.3d at 635. He transmitted nothing but his own opinion.

The jury had absolutely no idea what the informant said or thought. Foston's conviction cannot be held constitutionally infirm on the grounds that testimonial

[10] It is indeed arguable that Newell did not testify as "a true expert whose considered opinion sheds light on some specialized factual situation." *Johnson*, 587 F.3d at 635. The State made no showing that his opinion shed light on facts the jury was otherwise not capable of understanding for itself – as, for instance, when an agent might testify to the meaning of "Gimme wiggity, piece dove, it's straight," *see United States v. Freeman*, 498 F.3d 893, 899 (9th Cir. 2007), *cited in Foston*, 209 P.3d at 265 ¶ 17; *see also Johnson*, 587 F.3d at 633-34.

hearsay was admitted in violation of *Crawford*.

## B. Claims Related to Warrantless Monitoring

### 1. Appellate and Postconviction Proceedings

Foston's notice of appeal was filed in the Montana Supreme Court on May 6, 2008.[11] On August 20, 2008, before he filed his opening brief, the Montana Supreme Court decided that warrantless monitoring or recording of conversations with only one party's consent violates the Montana Constitution's strong privacy and search and seizure protections. Mont. Const. Art. II, §§ 10, 11; *State v. Goetz*, 191 P.3d 489, 504 ¶ 54 (Mont. 2008).

In light of *Goetz*, Foston's appellate counsel, Joseph Howard, moved the Montana Supreme Court to stay the appeal and remand his case to the trial court for a determination of whether testimony that was based on electronic monitoring should have been suppressed. The Montana Supreme Court denied the motion, noting that Foston "has not argued for the application of the plain error doctrine in his motion to remand" and concluding, "We thus decline to invoke it in this case." Order at 3, *State v. Foston*, No. DA 08-0225 (Mont. Oct. 29, 2008) (unpublished), *available at* http://supremecourtdocket.mt.gov (accessed Mar. 5, 2012).

---

[11] The docket is available under Foston's last name or case number DA 08-0225 in the "Closed Case Search" function at http://supremecourtdocket.mt.gov (accessed Mar. 5, 2012).

Howard filed Foston's opening brief on the merits on November 24, 2008. He briefed the law underlying the *Goetz* decision as applied to the facts of Foston's case, but he did not brief the issue of plain error review. *See* Appellant Br. at i-ii, 17-26 (doc. 21-3). The day after the brief was filed, the Montana Supreme Court held that the new rule of *Goetz* would apply to cases pending on direct review only if the defendant/appellant objected in the trial court to electronic monitoring without a warrant. *State v. Foster-DeBerry*, 197 P.3d 1004, 1006 ¶¶ 8-9 (Mont. 2008). Foston's reply brief, filed in January 2009, discussed plain error review, Reply at i, 2-5 (doc. 21-5), but the Montana Supreme Court held:

> On appeal, Foston makes a brief and conclusory assertion that this Court should undertake plain error review of the *Goetz* issue . . . . Foston has not provided any substantial reason why he is entitled to plain error review, and this issue was decided in the order denying his motion to stay and remand. *Goetz* does not apply to Foston's case for the reasons stated in our October 29, 2008, Order in this matter.

*Foston*, 209 P.3d at 264 ¶ 13. Foston's conviction was affirmed on May 28, 2009, *id.* at 265 ¶ 20, and his conviction became final on August 26, 2009.

In April 2010, Foston, acting pro se, filed a petition for postconviction relief in the trial court, alleging that Daly was ineffective for failing to object at trial to the warrantless monitoring of his conversations with the informant.[12] The petition was

---

[12] In its objection to Howard's motion for remand on direct appeal, the State had argued that Daly could have objected because he was initially charged in May 2007, nearly a year after the

denied, and Foston appealed.

While Foston's postconviction appeal was pending, in October 2010, the Montana Supreme Court overruled *Foster-DeBerry* and held that *Goetz* would apply retroactively to cases pending on direct review at the time it was issued, even if the defendant/appellant did not object in the trial court. *State v. Reichmand*, 243 P.3d 423, 426 ¶ 12 (Mont. 2010).

On December 28, 2010, the Montana Supreme Court held that, at the time of Foston's trial, Daly reasonably relied on federal and previous state authority permitting warrantless electronic monitoring with one person's consent.[13] Accordingly, on December 28, 2010, the court affirmed the trial court's denial of postconviction relief. *Foston v. State*, 245 P.3d 1103, 1106 ¶ 14 (Mont. 2010).

## 2. Retroactivity, Federal Law, and State Law

Foston claims the Montana Supreme Court erred in denying his motion for remand, erred in denying him plain error review on direct appeal, and denied him a

---

appeals in *Goetz* and a companion case, *Hamper*, were argued before the Montana Supreme Court, and those arguments were broadcast on the web and reported in the media. State's Obj. at 7, *Foston*, No. DA 08-0225 (Mont. filed Oct. 15, 2008), *available at* http://supremecourtdocket.mt.gov (accessed Mar. 5, 2012).

[13] Foston raised other issues on appeal, *see* Appellant Br. at i, 4-6 (doc. 21-9), but he did not raise those issues in his petition in the trial court, *see* Pet. for Postconviction Relief at 1-7 (doc. 21-7). The Montana Supreme Court declined to consider them. *Foston v. State*, 245 P.3d 1103, 1105 ¶ 11 (Mont. 2010).

20

full and fair opportunity to litigate his Fourth Amendment claim. These claims, like any federal habeas claims, can succeed only if federal law was violated. *Wilson v. Corcoran*, ___ U.S. ___, 131 S. Ct. 13, 16 (2010) (per curiam) (emphasis in original); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); 28 U.S.C. § 2254(a).

Warrantless electronic monitoring of a conversation does not violate the Fourth Amendment if one party consents to it,[14] *United States v. White*, 401 U.S. 745, 751 (1971), and Foston plainly was not deprived of "a 'full and fair opportunity to litigate' his *Fourth Amendment claim*," Pet. at 6 ¶ 15D (emphasis added), because he did not attempt to litigate a Fourth Amendment claim in the state courts. Consequently, Foston's *Goetz* claims could succeed only if federal law either (1) prescribes when a state court's decision on a matter of state law applies to cases pending on state direct or collateral review, or (2) prescribes the manner in which state courts must decide the scope of retroactive application, or (3) imposes a "fundamental fairness" obligation on the state courts that no reasonable jurist could find was *not* violated in this instance.

States are required to apply new *federal* constitutional rules to all cases pending on *direct* review at the time the new rule is announced. *Griffith v. Kentucky*,

---

[14] Neither here nor in state court did Foston claim the informant did not consent. The record implies consent. Trial Tr. at 294:17-295:22.

479 U.S. 314, 328 (1987), *cited in* Pet. at 5. The *Griffith* Court predicated its ruling on "basic norms of constitutional adjudication" and "the integrity of judicial review." *Id.* at 322-23. On collateral review in federal court, a new federal constitutional rule might or might not apply in a state prisoner's case. *See Teague v. Lane*, 489 U.S. 288 (1989) (plurality op.), *followed in Penry v. Lynaugh*, 492 U.S. 302, 313 (1989).

But both of these cases establish rules of *federal* constitutional adjudication. They do not purport to bind the state courts. I am not aware of any federal law requiring state courts to apply new *state* constitutional rules to cases pending on direct review at the time the new rule is announced. Nor am I aware of federal law that would authorize a federal habeas court to second-guess a state court's decision not to apply the state doctrine of plain error review to a claim of state law error. Nor was there anything fundamentally unfair about the Montana Supreme Court's manner of deciding Foston's cases. Foston's only argument against harmless error was based on Newell's opinion about the conversations. *See* Reply Br. at 1-4 (doc. 21-11) (concluding that, "[w]hile Newell never testified to any direct conversations . . . he did instill a legitimization to the fact that it was a conversation revolving around a drug deal.").

Ultimately, "[i]t is not the province of a federal habeas court to reexamine state court determinations on state law questions," *Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991), including the redressability of state constitutional violations. State courts "are free to choose the degree of retroactivity or prospectivity which [they] believe appropriate to the particular rule under consideration, so long as [they] give *federal* constitutional rights at least as broad a scope as the United States Supreme Court requires." *Danforth v. Minnesota*, 552 U.S. 264, 276 (2008) (quoting *State v. Fair*, 502 P.2d 1150, 1152 (Or. 1972) (en banc) (emphasis added)).

Foston might not prevail on the merits of his *Goetz* claims, but they fail at the threshold: they lack support in federal law. Claims 2-4, to the extent they have not been abandoned, should be denied.

## C. Conclusion

The facts of record, in light of the claims made, do not establish the constitutional violations Foston claims. Consequently, I recommend the petition and amended petition be denied for lack of merit.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Cases. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's

23

resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Foston does not make a substantial showing under *Crawford* that he was deprived of a constitutional right, and that is his only claim under the Confrontation Clause. Nor does he make a substantial showing that he was deprived of an opportunity to litigate a Fourth Amendment claim, which could not succeed on the merits in any case, nor does he have a federal right to the retroactive application of the Montana Supreme Court's decision under the Montana Constitution in *State v. Goetz*.

Reasonable jurists could not find merit in the claims Foston makes. A certificate of appealability should be denied for lack of a substantial showing that he was deprived of a constitutional right on any of the issues he has presented.

Based on the foregoing, the Court enters the following:

### ORDER

1. The State shall continue to preserve any and all recordings pending final completion of these proceedings, including any appellate proceedings.

2. The parties must comply with D. Mont. L.R. 72.3.

The Court also enters the following:

## RECOMMENDATION

1. The State's motion to dismiss (doc. 22) should be GRANTED.

2. The Petition and Amended Petition (docs. 1, 13) should be DENIED on the merits.

3. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

4. A certificate of appealability should be DENIED on all issues.

DATED this 8th day of March, 2012.

_____
Jeremiah C. Lynch
United States Magistrate Judge